# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| WYNDHAM HOTEL AND RESORT LLC,<br><br>*Plaintiff*,<br>v.<br>FIRST CAPITAL REAL ESTATE INVESTMENTS LLC, SUNEET SINGAL, and MAJIQUE LADNIER,<br><br>*Defendants*.<br><br>FIRST CAPITAL REAL ESTATE INVESTMENTS LLC, SUNEET SINGAL, and MAJIQUE LADNIER,<br><br>*Third-party Plaintiffs*,<br>v.<br>HMC HOSPITALITY OPERATING COMPANY,<br><br>*Third-party Defendant*. | Civil Action No. 18-9334<br><br>OPINION |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court by way of Third-party Defendant HMC Hospitality Operating Company's ("HMC" or "Third-party Defendant") Motion for Summary Judgment. ECF No. 30. For the reasons that follow, the Motion is granted.

## I. FACTUAL BACKGROUND

The Third-party Complaint involves claims for indemnification brought by First Capital Real Estate Investments, LLC ("First Capital"), Suneet Singal ("Singal"), and Majique Ladnier ("Ladnier" or, together with First Capital and Singal, "Third-party Plaintiffs") against HMC

1

pursuant to a hotel management agreement. Third-party Compl. ("TPC") ¶¶ 17-18; see also id., Ex. D (the "Management Agreement").

A. The Underlying Litigation

The underlying litigation in this matter involves a franchise termination dispute between Plaintiff Wyndham Hotels and Resorts, LLC ("Wyndham") and Third-party Plaintiffs. See generally Wyndham Compl., ECF No. 1.

On August 21, 2014, Wyndham entered into a franchise agreement with non-party Amarillo Ambassador 265, LLC ("Amarillo") for the operation of a hotel facility located at 3100 West Interstate 40, Amarillo, Texas, Site No. 48812-05214-01 (the "Hotel"). Id. ¶ 10; see also id., Ex. A (the "Franchise Agreement"). Pursuant to the Franchise Agreement, Amarillo agreed, in relevant part, to operate the Hotel for a fifteen-year term, make certain periodic payments to Wyndham "for royalties, marketing and global sales fees, taxes, interest, reservation system user fees, and other fees," and prepare and submit monthly financial reports to Wyndham. Id. ¶¶ 11-15. Wyndham could terminate the Franchise Agreement, with notice to Amarillo, "if Amarillo (a) discontinued operating the Hotel as a Wyndham guest lodging establishment; and/or (b) lost possession or the right to possession of the Hotel," and Amarillo agreed that in the event of a Franchise Agreement termination, it would pay liquidated damages pursuant to a formula in the Agreement. Id. ¶¶ 16-17; see also Franchise Agreement §§ 17.A, 18.C. Third-party Plaintiffs guaranteed Amarillo's Franchise Agreement obligations and agreed that, in the event of a default, they would "immediately make each payment and perform each obligation of [Amarillo] under the [Franchise] Agreement." Id. ¶¶ 19-21; see also id., Ex. C (the "Guaranty").

On or about October 11, 2017, Amarillo unilaterally terminated the Franchise Agreement by ceasing to operate the Hotel. Id. ¶ 22. Wyndham acknowledged Amarillo's termination by

2

letter dated November 8, 2017, and informed Amarillo that it owed $256,105.29 in liquidated damages, as well as other outstanding fees totaling $189,428.98. Id. ¶¶ 23, 27. The Guaranty requires Third-party Plaintiffs to pay these damages and fees, but to date they have not done so. Id. ¶¶ 25-27. On May 17, 2018, Wyndham filed a complaint against Third-party Plaintiffs, seeking to recover the outstanding amounts due under the Guaranty (the "underlying litigation"). See generally Wyndham Compl.

### B. The Third-party Complaint

On August 17, 2018, Third-party Plaintiffs filed a third-party complaint against HMC, alleging that they are entitled to indemnification and/or contribution from HMC pursuant to the Management Agreement because of HMC's "negligence in contributing to the loss alleged in" the underlying litigation. TPC ¶ 17.

#### 1. The Management Agreement

On April 1, 2014, HMC and Amarillo entered into the Management Agreement, pursuant to which HMC agreed "to be responsible for the management and running of" the Hotel, including hiring and firing Hotel employees.[1] Id. ¶¶ 18-20. HMC allegedly shut down the Hotel after it discovered that certain employees "engaged in embezzlement" and fired them. Id. ¶¶ 25-26. Third-party Plaintiffs allege that the Hotel's closure ultimately led to Wyndham bringing the underlying litigation.[2] Id. ¶¶ 45-47.

HMC agreed to indemnify Amarillo and its affiliates in the event of any acts or omissions constituting fraud, gross negligence, or willful misconduct (the "Indemnification Provision"). Id.

---

[1] The Management Agreement contains a Texas choice of law provision. See Management Agreement, Art. 16.

[2] HMC and Amarillo terminated the Management Agreement in November 2014. See infra Section I.B.2. It bears noting that this termination occurred nearly three years before Amarillo allegedly unilaterally terminated the Franchise Agreement with Wyndham, which is the subject of the underlying litigation. See Wyndham Compl. ¶ 22 (alleging that Amarillo terminated the Franchise Agreement in October 2017).

3

¶¶ 21-23. Third-party Plaintiffs allege that HMC's failure to train and supervise its employees, such that embezzlement occurred, triggered the Indemnification Provision. Id. ¶¶ 28-30. Third-party Plaintiffs claim that they are entitled to indemnification because the Guaranty makes them "affiliates" of Amarillo for purposes of the Management Agreement. Id. ¶¶ 37-42; see also Management Agreement, Art. 11.

### 2. The Termination Agreement

Amarillo and HMC terminated the Management Agreement on November 30, 2014. Third-party Plaintiffs' Statement of Material Facts ("TPP SOMF") ¶ 20, ECF No. 31.1; see also ECF No. 30.9 (the "Termination Agreement"). Pursuant to the Termination Agreement, HMC "terminate[d] all of the employees employed . . . at the Hotel," among other things. Termination Agreement § 2. Section 4 of the Termination Agreement contains a broad release of claims by both parties:

> [Amarillo and HMC] hereby waive, surrender and release each other and their partners, employees, officers, agents or representatives, from any liability, actions, causes of action, covenants, agreements, promises, claims, counterclaims, defenses, offsets, charges, recoupments, obligations and demands whatsoever (whether known or unknown, direct or indirect, contingent or non-contingent) at law, in equity of [sic] otherwise, which such party ever had or now has against the other, its partners, employees, officers, agents or representatives, by reason of any matter, cause or thing arising under or related to the Management Agreement; save and except the liabilities of [Amarillo] that survive the termination of the Management Agreement as provided [in Section 6 of the Termination Agreement.]

Termination Agreement § 4 ("Section 4"). Additionally, Amarillo "and its affiliates"

> consent[ed] to the termination . . . and release, discharge and hold harmless [HMC] . . . from any and all suits, claims, controversies, rights, promises, debts, liabilities, demands, obligations, costs, expenses, actions and causes of action of every nature, character and description, in law or in equity, whether presently known or unknown, vested or contingent, suspected or unsuspected, arising under, relating to, or in connection with (1) the Hotel, (2) the Management Agreement, and (3) [HMC]'s performance under the Management Agreement (collectively, the "Owners Released Claims"). [Amarillo and its affiliates] also covenant not to bring any suit, action, or proceeding, or make any demand or claims of any type, against

4

> [HMC] . . . with respect to any Owner Released Claims. <u>[HMC] . . . may plead or assert the release and covenant not to sue in this Section 5 as a complete defense and bar to any claim brought against any of them in contravention of this Section 5</u> and, if any such claim is brought against any of them, [Amarillo] shall indemnify, defend and hold harmless any such party from and against such claim.

Termination Agreement § 5 (emphasis added) ("Section 5," and together with Section 4, the "Termination Agreement Releases").[3] Singal executed the Termination Agreement on behalf of Amarillo and First Capital. TPP SOMF ¶ 27. The Termination Agreement contains a Texas choice of law provision. Termination Agreement § 7.

## II. PROCEDURAL HISTORY

Third-party Plaintiffs filed their Complaint on August 17, 2018, seeking a declaration that, to the extent Third-party Plaintiffs are found liable to Wyndham in the underlying litigation, they are entitled to indemnification from HMC. See TPC at 8. HMC moved to dismiss the TPC, arguing that the claim was barred by the Termination Agreement Releases. See ECF No. 13. On April 30, 2019, the Court denied that motion, finding that the Termination Agreement was not integral to or relied upon by the Third-party Complaint, and thus could not be considered at the motion to dismiss stage. See ECF No. 21 at 3-4. The Court ordered that limited discovery be taken on the issue of the scope of the Termination Agreement Releases. Id. at 4. HMC moved for summary judgment on September 6, 2019, ECF No. 30, which Third-party Plaintiffs now oppose, ECF No. 31.

---

[3] Section 6 explains continuing rights, duties, and obligations of Amarillo. Specifically, the "rights, duties and obligations of [Amarillo] and its affiliates, that by their nature or by the express language of the Management Agreement survive the expiration or earlier termination of such Management Agreement shall remain in full force and effect and survive" the Termination Agreement. Termination Agreement § 6. It also enumerates a number of obligations Amarillo owed to HMC at the time the Termination Agreement was executed. Id.

5

### III. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with available affidavits, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[S]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Ind. Hosp., 843 F.2d 139, 143 (3d Cir. 1988). All facts and inferences must be construed in the light most favorable to the non-moving party. Peters v. Del. River Port Auth., 16 F.3d 1346, 1349 (3d Cir. 1994).

### IV. DISCUSSION

#### A. Choice of Law

HMC argues that the Court should apply New Jersey law when interpreting the Termination Agreement, even though the Termination and Management Agreements both contain Texas choice of law provisions. See HMC Br. at 3-6, ECF No. 30.2. Because the Court discerns no conflict between Texas and New Jersey law, it will apply New Jersey law.[4]

A federal court sitting in diversity applies the choice of law rules of the state in which it is located. Collins v. MaryKay, Inc., 874 F.3d 176, 183 (3d Cir. 2017). As such, New Jersey choice of law rules apply here.

In New Jersey, "[t]he first step in a conflicts analysis is to decide whether there is an actual conflict between the laws of the states with interests in the litigation." Continental Ins. Co. v.

---

[4] Third-party Plaintiffs make no choice-of-law arguments. They do, however, rely on New Jersey case law governing contractual interpretation in their brief. See Third-party Pl. Br. at 1-2, ECF No. 31.

Honeywell Int'l, Inc., 234 N.J. 23, 46 (2018) (citing P.V. ex rel. T.V. v. Camp Jaycee, 197 N.J. 132, 143 (2008)). Where there is no conflict, "the choice-of-law question is inconsequential, and the forum state applies its own law to resolve the disputed issue." Rowe v. Hoffman-La Roche, Inc., 189 N.J. 615, 621 (2007). To find a conflict, there must be "a substantive difference between the laws of the interested states." Continental, 234 N.J. at 46 (internal quotation marks and citations omitted).

Here, the Court finds no substantive difference between New Jersey and Texas law governing releases. Under both New Jersey and Texas law, a release is merely a form of a contract to which the usual rules of contractual interpretation apply. See Cooper v. Borough of Wenonah, 977 F. Supp. 305, 311-12 (D.N.J. 1997) ("[C]ontract principles determine the rights of the parties [to a release]."); Baty v. ProTech Ins. Agency, 63 S.W.3d 841, 848 (Tex. App. 2001) ("Like any other agreement, a release is subject to the rules of construction governing contracts."). Looking further to each state's contractual interpretation principles, the Court finds no relevant difference that is "outcome determinative" such that it would be "substantive." See McCarrell v. Hoffmann-LaRoche, Inc., 227 N.J. 569, 584 (2017); see also, e.g., Davis v. Dell, Inc., No. 07-630, 2008 WL 3843837, at *3 (D.N.J. Aug. 15, 2008) (collecting cases and noting that "[u]nder both Texas and New Jersey law when interpreting a term in a contract, it is appropriate to look at the circumstances surrounding the formation of the contract"); compare M.J. Paquet, Inc. v. N.J. Dep't of Transp., 171 N.J. 378, 396 (2002) ("Generally, the terms of an agreement are to be given their plain and ordinary meaning.") and Cumberland Cnty. Improvement Auth. v. GSP Recycling Co., Inc., 358 N.J. Super. 484, 497 (App. Div. 2003) ("[A contract] should not be interpreted to render one of its terms meaningless.") with Heritage Resources, Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996) ("We give terms their plain, ordinary, and generally accepted meaning[.]") and Kelley-

Coppedge, Inc. v. Highlands Ins. Co., 980 S.W.2d 462, 464 (Tex. 1998) (holding that Texas contractual interpretation rules require a court to "attempt to give effect to all contract provisions so that none will be rendered meaningless"). Because there is no actual conflict between the laws of these jurisdictions, the Court applies New Jersey law to interpret the scope of the Termination Agreement.

### B. Contractual Interpretation

HMC argues that the Termination Agreement Releases bar Third-party Plaintiffs' claims. HMC Br. at 6-10, 15-20. Third-party Plaintiffs argue their claims are not barred because HMC's indemnification obligations under the Management Agreement could not be terminated. Third-party Pl. Br. at 1-2. The Court agrees with HMC.

Under New Jersey law, contractual interpretation "is a question of law for the court to determine, and can be resolved on summary judgment." Adron, Inc. v. Home Ins. Co., 292 N.J. Super 463, 473 (App. Div. 1996). "[A] signed release carries considerable weight" and will be given its "plain and ordinary meaning." M.J. Paquet, 171 N.J. at 396. "Where the terms of a contract are clear and unambiguous . . . [the Court] must enforce those terms as written." Karl's Sales & Serv., Inc. v. Gimbel Bros., Inc., 249 N.J. Super. 487, 493 (App. Div. 1991), certif. denied 127 N.J. 548 (1991).

Here, the Termination Agreement Releases are unambiguous. Section 4 releases HMC and Amarillo "from any liability, actions, causes of action, covenants, agreements, promises, claims, counterclaims, defenses, offsets, charges, recoupments, obligations, and demands whatsoever . . . arising under or related to the Management Agreement." Termination Agreement § 4. Additionally, under Section 5, Amarillo specifically "release[d], discharge[d] and h[eld] harmless [HMC] . . . from any and all suits . . . whether presently known or unknown . . . arising under, or

in connection with" the Management Agreement. Termination Agreement § 5. Applying the plain meaning of these terms, the Court finds that Third-party Plaintiffs' claims are barred because they arise under the Management Agreement: the Third-party Complaint is entirely premised on the notion that HMC breached the Management Agreement by failing to properly train and supervise employees of the Hotel. See TPC ¶ 20 ("Pursuant to the Management Agreement, [HMC] promised and covenanted to be responsible for the hiring of employees for the day to day running of [the Hotel]."); id. ¶ 28 ("Pursuant to [Management Agreement] Article 11, employees hired directly by [HMC] who are not properly trained and engage in fraud result in [HMC] being liable in gross negligence."); id. ¶¶ 44-45 (describing how HMC's conduct under the Management Agreement "resulted in the closure of" the Hotel). As such, under the Termination Agreement Releases, Third-party Plaintiffs' claims were released as of the date of the Termination Agreement.

Third-party Plaintiffs do not dispute that their claims arise out of the Management Agreement or that the Termination Agreement Releases are unambiguous. Instead, they invoke Section 6 of the Termination Agreement, which preserves the "rights, duties and obligations of [Amarillo] . . . that by their nature or by the express language of the Management Agreement survive the expiration or earlier termination of such Management Agreement," and then goes on to list various obligations that Amarillo owed to HMC. Termination Agreement § 6 ("Section 6"); see also Third-party Pl. Br. at 2. The claims here are not barred, they argue, because the Management Agreement provides that all "indemnification obligations under [the Management Agreement] . . . shall survive the expiration and any termination of th[e Management] Agreement." Management Agreement, Art. 11(c). The Court disagrees.

Adopting Third-party Plaintiffs' reading of Section 6 would render Section 5, which reiterates that Amarillo releases any and all claims against HMC related to the Management

9

Agreement, largely meaningless, because it would allow Amarillo and its affiliates to bring indemnification claims related to HMC's performance under the Management Agreement. Traditional contract principles caution against interpreting contracts in this manner. See, e.g., Cumberland Cnty. Improvement Auth., 358 N.J. Super. at 497 ("[A contract] should not be interpreted to render one of its terms meaningless.").

To give meaning to each contractual term, the Court considers "the contractual scheme as a whole." Newark Publishers' Ass'n v. Newark Typographical Union, No. 103, 22 N.J. 419, 426 (1956). Section 4 mutually releases Amarillo and HMC from all claims "save and except the liabilities of [Amarillo] that survive the termination of the Management Agreement as provided therein and in Section 6 below." Termination Agreement § 4 (emphasis added). Moreover, Section 5 provides that Amarillo and its affiliates "covenant not to bring any suit, action, or proceeding . . . against [HMC]" related to the Management Agreement and that HMC "may plead or assert the release and covenant not to sue in this Section 5 as a complete defense and bar to any claim brought against [HMC] in contravention of this Section." Termination Agreement § 5 (emphasis added). In describing Amarillo's broad release of claims, Section 5 contains no qualifications of any kind. It makes no reference to Section 6 or Amarillo's rights that Third-party Plaintiffs argue are preserved therein. The preceding sections of the Agreement thus demonstrate that Section 6 is intended to enumerate obligations of Amarillo that survive the Termination Agreement, which HMC can still sue to enforce pursuant to Section 4.

This finding is consistent with Section 6's plain language, which, other than the passing reference to Amarillo's "rights" in its introductory sentence, lists several other areas in which Amarillo agreed to "remain liable to [HMC]," including "all indemnification and hold harmless obligations of [Amarillo to HMC]" under the Management Agreement. Termination Agreement

10

§ 6. The focus of Section 6, then, is on Amarillo's liabilities under the Management Agreement—including indemnification. Finding that Section 6 somehow swallows the Termination Agreement Releases would therefore be inconsistent with "the context and the contractual scheme as a whole." Newark Publishers' Ass'n, 22 N.J. at 426; see also Hardy ex rel. Dowdell v. Abdul-Matin, 198 N.J. 95, 103 ("A basic principle of contract interpretation is to read the document as a whole in a fair and common sense manner.") (emphasis added).

As such, the Court finds that the Termination Agreement bars Third-party Plaintiffs' claims and summary judgment is appropriate.

V. CONCLUSION

For the reasons stated above, HMC's Motion for Summary Judgment, ECF No. 30, is **GRANTED**, and the Third-party Complaint is **DISMISSED**. An appropriate order follows.

Dated: April 2, 2020

>  */s Madeline Cox Arleo*
>  **HON. MADELINE COX ARLEO**
>  **UNITED STATES DISTRICT JUDGE**